## S02A1678. MAYFIELD v. THE STATE.
### (578 SE2d 438)

HINES, Justice.

Pierre Mayfield appeals his convictions for felony murder, aggravated assault, and burglary in connection with the fatal shooting of Demetrius Holder and the wounding of Stanley Holder. He contends

that the trial court inappropriately interfered with the deliberative process of the jury thereby denying his right to a fair trial and due process of law, and that the trial court erred by giving the jury an *Allen*[1] charge. Finding that the contentions fail to provide a basis for the reversal of Mayfield's convictions, we affirm.[2]

The evidence construed in favor of the verdicts showed the following: On April 22, 1999, brothers Demetrius Holder and Stanley Holder were living in an apartment in DeKalb County, and a friend, Bobby McAfee, was staying as a guest; the Holder brothers sold drugs. Around 5:00 p.m., Stanley entered his apartment and saw Demetrius, Pierre Mayfield ("Mayfield"), Dierron Mayfield, and Kevin Hines. Bobby was taking a shower. Demetrius told Stanley that Mayfield, Dierron, and Kevin wanted to buy some drugs. Stanley replied that he did not have any. Mayfield, Dierron, and Kevin each pulled pistols out from their pants and told him in unison to "give it up." Kevin and Mayfield took Demetrius into the bedroom at gunpoint. Dierron took Stanley into the kitchen at gunpoint. Dierron told Stanley to get the drugs, but Stanley started "tussling" with Dierron. While Stanley and Dierron were "tussling," Stanley heard Demetrius offer Mayfield and Kevin $400 each, but Kevin replied "we want it all." Stanley then heard a gunshot from the bedroom. Stanley fought off Dierron and ran into the living room, where Dierron shot him in the back and in the stomach. Stanley ran out of the apartment and down the stairs, where Dierron shot him in the arm. When Bobby got out of the shower, he found Demetrius lying on the bedroom floor and Stanley lying by the stairs.

When the police arrived, they found Demetrius lying face down at the foot of the bed with no signs of life. There was blood on Demetrius's shirt and shorts, on the floor, and on the bedspread. Demetrius was wearing an orange t-shirt with a hole in the front and in the back which corresponded with the gunshot he had received.

---

[1] *Allen v. United States*, 164 U. S. 492, 501 (9) (17 SC 154, 41 LE 528) (1896).

[2] The crimes occurred on April 22, 1999. On July 26, 1999, a DeKalb County grand jury indicted Pierre Mayfield, along with Kevin Hines and Dierron Mayfield, for: (1) the malice murder of Demetrius Holder; (2) the felony murder of Demetrius Holder while in the commission of aggravated assault; (3) the aggravated battery of Stanley Holder; (4) the kidnapping of Demetrius Holder; (5) the aggravated assault of Stanley Holder; and (6) the burglary of Stanley Holder's home. Pierre Mayfield was tried before a jury September 12-16, 2000, and found guilty of the felony murder of Demetrius Holder, the aggravated assault of Stanley Holder, and burglary; the jury acquitted Pierre Mayfield of malice murder, aggravated battery, and kidnapping. On September 27, 2000, Pierre Mayfield was sentenced to life imprisonment for felony murder, a concurrent 20 years in prison for aggravated assault, and a concurrent 20 years in prison for burglary. A motion for new trial was filed on October 10, 2000, and it was denied on June 24, 2002. A notice of appeal was filed on June 27, 2002, and the case was docketed in this Court on July 18, 2002. The appeal was submitted for decision on September 9, 2002.

Demetrius had a gunshot entrance wound in his back a little bit to the right of his spine and a gunshot exit wound in the front left of his chest a little bit left of center; he bled to death internally and lost blood externally as well. Due to the gunshot injuries, Stanley was hospitalized for four months and endured fifteen surgeries; his left leg and arm were paralyzed.

The police interviewed Stanley in the hospital, and he picked Mayfield and Dierron out of a photographic lineup. Kevin and Dierron were later arrested out of state. Mayfield turned himself in to the police. Mayfield told the police that Kevin "did the shooting" and that he had only done what Kevin told him to do after Kevin held a gun to his head and threatened to kill him. Kevin pled guilty to voluntary manslaughter and kidnapping and testified at Mayfield's trial. Dierron pled guilty to aggravated battery and also testified at the trial.

1. The evidence was sufficient to enable a rational trier of fact to find Mayfield guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Mayfield contends that the trial court inappropriately interfered with the deliberative process of the jury and erred by giving the jury an *Allen* charge. Resolution of these contentions requires examination of the circumstances at trial.

During deliberations, the jury sent out several notes. One of the notes, Juror Inquiry No. 5 stated: "We have someone that says they have to vote their conscience not the law. What do we do?" The trial court assembled Mayfield, his attorney, and the assistant district attorney to discuss the matter. The trial court then asked for input on whether the juror needed to be identified. Mayfield's counsel suggested that the court not respond to the inquiry at that time because other jury questions that were sent out after the inquiry in question indicated that "there's a process ongoing." The trial court stated that it believed it could call the jurors out to find out if it was necessary to respond to the question, and that it did not know what else to do other than to remind the jurors of their oaths and the portion of the charge that instructs that jurors are bound by the law and must apply the law to the facts as they ascertain them. The parties then discussed the contents of the court's charge, and the court consulted a legal handbook on the question of the removal of a juror. Mayfield's counsel suggested that the court respond that the note regarding the questionable juror was not an issue for the court at that time and then wait to see what happened. The State opined that it was incumbent upon the court to ask the foreman what the note meant.

The trial court summoned the alternate juror into the courtroom, and then asked the jury foreman to come into the courtroom and to leave the door to the jury room open, in order that the entire jury

hear the court's comments. The court read the note to the foreman, and asked him if there was a juror who refused to follow the law. The foreman replied that there appeared to be someone who felt that personal feelings about the unfairness of the law might supersede the law as it had been charged. The court then inquired about another jury note asking for the legal definitions of coercion and intent, and asked if a recharge in that regard would help. The foreman replied that he believed that it might help the person who wrote the note. The court brought the entire jury into the courtroom, and stated that it was going to send the jury the charge on coercion and intent, and asked the jury, after a reasonable length of time expired, to report back to the court about whether there was any change in the subject of Juror Inquiry No. 5, i.e., the juror voting his or her conscience instead of the law. The jury was then given a brief recess. The court stated that if the juror issue recurred, it would "call out" the juror in question and inquire if the juror was unable to follow the law. There was no objection to this proposal by Mayfield's counsel or by the State.[3] Deliberations continued.

Subsequently, the jury sent out another note asking whether it needed to consider the concepts of party to a crime and conspiracy as to each count. The court brought the jury, along with the alternate juror, into the courtroom and instructed the jurors that they did need to consider party to a crime and conspiracy on each count. The court addressed the issue of Juror Inquiry No. 5 by repeating the oath that the jurors took and recharging the jurors that it was the court's duty and responsibility to ascertain the applicable law and to so instruct the jurors while it was the jurors' responsibility to ascertain the facts from all the evidence presented and then to apply the law given in the court's charge to the facts as they found them to be. The court then instructed the jury to return to the jury room, and advise the court if conditions did not change. The court asked for any exceptions to the recharge. Mayfield's counsel stated that the jury notes sent following Juror Inquiry No. 5 indicated that deliberations were continuing, and thus, the court had improperly injected itself into the jury process and caused the juror in question, whomever he or she was, to feel that he or she had to give up a position of conscience; the attorney added that the court's language "intends to coerce a verdict from this jury which they may not be able to reach." There was then a dis-

---

[3] Mayfield's trial attorney objected to the trial court's procedure in sending written portions of the court's charge to the jury; but, this procedure is not argued as error in this appeal, and therefore, will not be addressed. However, in regard to the practice of giving the jury copies of jury instructions, see *Miner v. State*, 268 Ga. 67 (2) (485 SE2d 456) (1997); *Anderson v. State*, 262 Ga. 26, 28 (3) (413 SE2d 732) (1992); *Appling v. State*, 256 Ga. 36, 38 (2) (343 SE2d 684) (1986); see also *Brewton v. State*, 216 Ga. App. 346, 349 (4) (454 SE2d 558) (1995), rev'd on other grounds, 266 Ga. 160 (465 SE2d 668) (1996).

cussion regarding an alternate juror, and the trial court had the jury notes made part of the record.

The jury sent out another note asking whether "being 'hung' " on one count meant that the jury was " 'hung' on all counts." The court stated that the answer to the question was "no," and Mayfield's counsel agreed. The court further stated that it would "just call the foreperson out" when the State informed the court that it was made aware that the jury had sent a message that it was ready to be addressed by the court on the matter of Juror Inquiry No. 5. The court called the jury foreman into the courtroom, directing again that the jury room door was to be left open. The foreman told the court that it appeared that a juror was unwilling to consider each count "on its own merit," and that this was hindering deliberations. The court asked the juror in question, Mr. Favors, to enter the courtroom; the door to the jury room was closed.

The court asked Favors if Juror Inquiry No. 5 was about him. Favors replied that he did not think so, and that two of the criminal charges had been decided. Favors then related that deliberations were continuing on the other four counts and gave the numeric standing on them. Favors also told the court that the count that he had problems with was completed, that there were other jurors sharing his opinions on the remaining counts, and that all the jurors needed to come into the courtroom. The entire jury and the alternate were brought into the courtroom and the court asked for the numeric standing on each count, with the court first cautioning that it did not want to know whether the standings were "for guilty or not guilty." The foreman provided the numeric standing on each count without mentioning any determination of guilt. The jury was then excused from the courtroom.

After the jury was removed, the court suggested giving an *Allen* charge on the counts remaining in dispute. Mayfield's attorney moved for a mistrial, arguing that the jury was "contaminated totally" because it should not have been questioned while deliberations were continuing and that juror Favors should not have been singled out. The motion for mistrial was denied, and the court again indicated that it intended to give an *Allen* charge. After both Mayfield's counsel and the State expressed the belief that an *Allen* charge was then premature, the court agreed to delay giving the charge, and instructed the jury foreman that the jury should continue its deliberations. After another juror inquiry was relayed to the court, the foreman reported that a third count had been resolved and that the jury wanted to continue deliberations. Following further deliberations, the foreman informed the court that the jury had reached verdicts on all counts except two and four. The jury was excused for the evening and instructed to return the following morning.

The next day during deliberations a dispute arose in the jury room and a juror threatened violence. The State indicated that it was time for an *Allen* charge, and Mayfield's attorney stated, "They certainly need that." Defense counsel then asked the court to accept the verdicts on the decided counts and to declare a mistrial on the undecided charges. The State opposed the defense motion and asked for an *Allen* charge. The court indicated that it would give an *Allen* charge, and defense counsel objected, arguing that a mistrial had to be granted. The court summoned the jurors into the courtroom and asked whether the jury had reached verdicts on the remaining two counts. The foreman responded that verdicts had not been reached. The court acknowledged that "there may have been a little bit of a problem between the jurors" over deliberations and then gave an *Allen* charge.[4] The defense renewed its motion for mistrial and objected that the *Allen* charge was "coercive on its face." A mistrial was denied and the jury reached verdicts on each of the six counts.

(a) Mayfield maintains that the trial court's action in singling out Juror Favors was coercive to Favors and to the other jurors that were thinking and voting the same way as Favors. However, the circumstances do not support the claim.

When the trial court received Juror Inquiry No. 5, it had no reason to doubt the veracity of the expressed concern that a juror appeared to be indicating a deliberate refusal to follow the law. OCGA § 15-12-172 confers upon the trial court the general authority

---

[4] The court charged:

You have now been deliberating on this case for a considerable period of time. And the Court deems it proper to advise you further in regards of the desirability of agreement, if possible. The case has been exhaustively and carefully tried by both sides and has been submitted to you for decision and verdict, if possible, and not for disagreement. It is the law that a unanimous verdict is required. And while this verdict must be the conclusion of each juror and not a mere acquiescence of the jurors in order to reach an agreement, it is still necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with the proper regard for and deference to the opinions of each other. A proper regard for the judgment of others will greatly aid us in forming our own judgment. Now, this case must be decided by some jury selected in the same manner that this jury was selected. And there is no reason to think a jury better qualified than you would ever be chosen. Each juror should listen to the arguments of the other jurors with the disposition to be convinced by them. If the members of the jury differ in their views of the evidence, the difference of opinion should cause them all to scrutinize the evidence more closely and to reexamine the grounds of their opinion. Your duty is to decide the issues which have been submitted to you, if you can conscientiously do so. Now, in conferring you should lay aside all mere pride of opinion and should bear in mind that the jury room is no place for taking up, maintaining any spirit of controversy either side of a cause. You should ever bear in mind that as jurors you should not be advocates for either side. Now aim to keep in view as the truth as it appears from the evidence examined in light of the instructions of the Court. Now, you may again retire to your room for a reasonable time and examine your differences in a spirit of fairness and candor and try to arrive at a verdict.

to discharge a juror and replace that juror with an alternate. *Reynolds v. State*, 271 Ga. 174, 175 (2) (517 SE2d 51) (1999). The statute "authorizes the trial court to seat an alternate juror in the place of a juror who becomes ill or for other good or legal cause is incapacitated. The trial court must exercise its discretion in making the substitution, and is free to do so even after deliberations have begun." *Williams v. State*, 272 Ga. 828, 830 (5) (537 SE2d 39) (2000). Certainly, a juror's refusal to decide the case on the evidence under the law as charged by the court would provide legal cause for that juror's removal. See *McGuire v. State*, 200 Ga. App. 509, 510 (3) (408 SE2d 506) (1991). Thus, the trial court had to delve further into the matter. The trial court tried several approaches to resolving the potential problem prior to calling in Juror Favors, including further inquiry directed to the jury foreman. But when the problem seemed to be continuing and hindering the jury's deliberations, the trial court was well within its province to bring out Favors, thought to be the problem juror, to determine whether his removal would be legally necessary.

The assertion that the trial court's comments to Favors were coercive also fails. The court never characterized Favors' alleged behavior, or that of any other juror, as unreasonable or unacceptable, or made any disparaging comment to Favors or the other jurors; the trial court made no statements that could be construed as attempting to force any juror to give up his or her honest opinion. The fact that the court did not reiterate that a juror should not surrender his or her convictions merely in order to reach a verdict did not render its treatment of the situation coercive. Compare *Riggins v. State*, 226 Ga. 381, 384 (174 SE2d 908) (1970); *Domingo v. State*, 211 Ga. 691, 696 (88 SE2d 1) (1955). The trial court's handling of the matter did not constitute improper interference in the deliberative process.

(b) Nor was it error for the trial court to give the *Allen* charge. The decision of whether to give an *Allen* charge is within the discretion of the trial court. *Ponder v. State*, 268 Ga. 544, 546 (3) (491 SE2d 363) (1997). The jury had spent substantial time unsuccessfully attempting to resolve dissension on the remaining charges and the stalled deliberations had become heated to the point of the threat of physical violence. Thus, the giving of an *Allen* charge after the trial court ascertained the numerical divisions was not an abuse of discretion. *Gibson v. State*, 272 Ga. 801, 803 (3) (537 SE2d 72) (2000).

In regard to the language of the *Allen* charge itself, the issue on appellate review is whether the instruction is so coercive as to cause a juror to "abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." (Punctuation omitted.) *Wright v. State*, 274 Ga. 305, 307 (2) (553 SE2d 787) (2001). The *Allen* charge given in this case is the pattern charge, but for sev-

eral slips of the tongue by the trial court. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2nd ed.), Part 5 (J), pp. 156-157 (2001). The language in the charge cannot be deemed coercive because it would not cause a juror to "abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." (Punctuation omitted.) *Wright v. State*, supra at 307 (2). In fact, quite the contrary is shown. The charge cautioned the jurors that the verdict was not to be the jurors' "mere acquiescence in order to reach an agreement," that any difference of opinion should cause the jurors to "scrutinize the evidence more closely," and that the aim was to keep the truth in view as it appeared from the evidence, considered in light of the court's instructions. See footnote 4, supra. Finally, following the publication of the verdicts and pursuant to Mayfield's request, the jurors were polled and each one affirmed that the verdicts announced were the ones that he or she had reached and agreed upon. See *Stephens v. State*, 261 Ga. 356, 357 (4) (405 SE2d 470) (1991).

*Judgments affirmed. All the Justices concur.*

SEARS, Presiding Justice, concurring.

A jury must be "free to act and free from any seeming or real coercion on the part of the [trial] court."[5] "Each juror has the right to form his own conviction. He is not required to surrender it because he is in the minority. He is not required to agree with the majority rather than cause a mistrial."[6] A trial court should take steps to avoid suggesting (either explicitly or implicitly) to a jury that one or more of it members should surrender his or her beliefs, as under the law a juror has an unfettered right to hold fast to his convictions and is not required to surrender them simply because he is in the minority.[7]

In this case, I agree with the majority that the trial court's actions were not improperly coercive and did not ultimately suggest that an individual juror should align his convictions with the rest of the jury. However, I write separately to caution that trial courts should proceed with extreme caution when confronted with the possibility of a recalcitrant juror. The practice of singling out an individual juror, such as occurred here, is especially dangerous, as it may be misconstrued as an effort to coerce or even intimidate the juror into surrendering his or her personal convictions. As noted by the Court of Appeals, for a trial court "to call in a single juror is an unwise practice fraught with possibilities of inviting trouble and . . . the better

---

[5] *Riggins v. State*, 226 Ga. 381, 384 (174 SE2d 908) (1970).
[6] *Riggins*, 226 Ga. at 385.
[7] *Domingo v. State*, 211 Ga. 691, 696 (88 SE2d 1) (1955).

procedure is [always] to summon the entire jury"[8] when confronted with this sort of situation.

DECIDED MARCH 24, 2003.

*Virginia W. Tinkler*, for appellant.

*J. Tom Morgan, District Attorney, Barbara B. Conroy, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ruth M. Pawlak, Assistant Attorney General*, for appellee.

---

[8] *Mosley v. State*, 145 Ga. App. 651, n. 1 (244 SE2d 610) (1978).